IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| DARRELL R. PENDLEY, | ) | Civil No.: 6:13-cv-01945-JE |
| | ) | |
| Plaintiff, | ) | FINDINGS AND |
| | ) | RECOMMENDATION |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

James W. Moller
8655 SW Citizens Dr., Suite 104
Wilsonville, OR 97070

Mark A. Manning
Harder Wells Baron & Manning, PC
474 Willamette Street, Suite 200
Eugene, OR 97401

       Attorneys for Plaintiff

Billy J. Williams, Acting U.S. Attorney
Janice Hebert, Asst. U.S. Attorney
1000 S.W. 3rd Avenue, Suite 600
Portland, OR 97204

FINDINGS AND RECOMMENDATION – 1

Heather Griffith, Special Asst. U.S. Attorney
Office of the General Counsel
Social Security Administration
701 5th Avenue, Suite 2900 M/S 221 A
Seattle, WA 98104-7075

     Attorneys for Defendants

JELDERKS, Magistrate Judge:

Plaintiff Darrell Pendley brings this action pursuant to 42 U.S.C. §405(g) seeking judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying his applications for disability insurance benefits (DIB) and supplemental security income (SSI) under the Social Security Act (the Act). Plaintiff seeks an Order remanding the action to the Social Security Administration (the Agency) for an award of benefits. In the alternative, he seeks an Order remanding the action for further proceedings.

For the reasons set out below, the Commissioner's decision should be affirmed.

**Procedural Background**

Plaintiff protectively filed applications for SSI and DIB on May 16, 2008, alleging he had been disabled since June 21, 2005. After his claims were denied initially and on reconsideration, a hearing was held before Administrative Law Judge (ALJ) Joseph Grow. On November 3, 2009, ALJ Grow issued an unfavorable decision that became the final decision of the Commissioner when the Appeals Council denied request for review.

Plaintiff sought judicial review of the ALJ's decision and in an Opinion and Order dated June 19, 2012, the District Court remanded the case to the Commissioner for further proceedings.[1]

---

[1] United States District Court for the District of Oregon Case Number 3:11-cv-6131-BR

FINDINGS AND RECOMMENDATION – 2

In response to the District Court's Order, the Appeals Council vacated the Commissioner's previous decision and remanded the case to an ALJ. In its remand order, the Appeals Council also noted that Plaintiff had filed subsequent applications for benefits in November 2009. Those applications had been denied in a hearing decision dated June 29, 2012. The Appeals Council deemed the subsequent claim to be duplicative in light of its action with respect to the initial claim and instructed the ALJ on remand to consolidate and render a new decision on both claims.

Upon remand, a hearing was held before ALJ John Michaelsen on June 14, 2013. Plaintiff and Vocational Expert (VE), Mark McGowan, testified at the hearing.  In a decision dated July 11, 2013, ALJ Michaelsen found that Plaintiff had not been under a disability within the meaning of the Act from June 21, 2005 through the date of his decision.  In the present action, Plaintiff challenges that decision.

## Background

Plaintiff was born in 1965 and was 48 years old at the time of the second ALJ decision. He completed ninth grade and has past relevant work as a painter and a chemical processing laborer.

## Disability Analysis

The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act.  20 C.F.R. §§ 404.1520, 416.920.  Below is a summary of the five steps, which also are described in Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

FINDINGS AND RECOMMENDATION – 3

Step One.  The Commissioner determines whether the claimant is engaged in substantial gainful activity (SGA).  A claimant engaged in such activity is not disabled.  If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to evaluate the claimant's case under Step Two.  20 C.F.R. § 404.1520(b).

Step Two.  The Commissioner determines whether the claimant has one or more severe impairments.  A claimant who does not have such an impairment is not disabled.  If the claimant has a severe impairment, the Commissioner proceeds to evaluate the claimant's case under Step Three.  20 C.F.R. § 404.1520(c).

Step Three.  Disability cannot be based solely on a severe impairment; therefore, the Commissioner next determines whether the claimant's impairment "meets or equals" one of the presumptively disabling impairments listed in the Social Security Administration (SSA) regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1.  A claimant who has such an impairment is disabled.  If the claimant's impairment does not meet or equal an impairment listed in the regulations, the Commissioner's evaluation of the claimant's case proceeds under Step Four. 20 C.F.R. § 404.1520(d).

Step Four.  The Commissioner determines whether the claimant is able to perform relevant work he or she has done in the past.  A claimant who can perform past relevant work is not disabled.  If the claimant demonstrates he or she cannot do work performed in the past, the Commissioner's evaluation of the claimant's case proceeds under Step Five.  20 C.F.R. § 404.1520(f).

Step Five.  The Commissioner determines whether the claimant is able to do any other work.  A claimant who cannot perform other work is disabled.  If the Commissioner finds that the claimant is able to do other work, the Commissioner must show that a significant number of

jobs exist in the national economy that the claimant can do.  The Commissioner may satisfy this burden through the testimony of a vocational expert (VE) or by reference to the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2.  If the Commissioner demonstrates that a significant number of jobs exist in the national economy that the claimant can do, the claimant is not disabled.  If the Commissioner does not meet this burden, the claimant is disabled.  20 C.F.R. § 404.1520(g)(1).

At Steps One through Four, the burden of proof is on the claimant.  <u>Tackett</u>, 180 F.3d at 1098.  At Step Five, the burden shifts to the Commissioner to show that the claimant can perform jobs that exist in significant numbers in the national economy.  <u>Id.</u>

## Medical Record and Testimony

The court has carefully reviewed the extensive medical record and Plaintiff's hearing testimony, and the parties are familiar with both. Accordingly, the details of that evidence will be set out below only as they relate to the issues before the court.

## ALJ's Decision

In recounting the procedural history of the case, ALJ Michaelsen noted that:

the District Court found the prior [ALJ's] decision was well supported, concluding only that it was unclear whether or not the claimant could actually perform the jobs cited by the [VE] at the hearing, given the hearing decision residual functional capacity.  It is noteworthy that the District Court found that the hearing decision residual functional capacity was well supported by the evidence in the record, and that the ALJ's finding that the claimant was not entirely credible was also supported by substantial evidence. For that reason, this decision will incorporate substantial portions of the prior decision.

Tr. 657.

The ALJ determined that Plaintiff last met the insured status requirements under the Act

FINDINGS AND RECOMMENDATION – 5

on September 30, 2008.

At the first step of his disability analysis, the ALJ found that Plaintiff had not engaged in substantial gainful activity since June 21, 2005.  The ALJ noted that Plaintiff worked after his alleged disability onset date but that this work activity did not rise to the level of substantial gainful activity.

At the second step, the ALJ found that Plaintiff's severe impairments included a history of traumatic brain injury, a history of a transient ischemic attack (TIA);[2] a history of carotid artery stenosis, status-post carotid endarterectomy; diabetes mellitus; left upper extremity tendon tear; bipolar disorder and a history of alcohol abuse.

At the third step, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or equaled a presumptively disabling impairment set out in the Listings, 20 C.F.R. Part 404, Subpart P, App. 1(20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

The ALJ next assessed Plaintiff's residual functional capacity (RFC).  He found that Plaintiff retained the capacity to perform less than the full range of light exertional level work and was subject to the following limitations:

> He is able to pull with his left upper extremity occasionally. He is able to finger with his left hand occasionally. He should never climb ladders, ropes, or scaffolds. He is able to crawl and climb ramps and stairs occasionally. He should avoid exposure to heavy machinery and unprotected heights. The claimant is able to have occasional interaction with the public and coworkers.

---

[2] A transient ischemic attack (TIA) produces similar symptoms to a stroke, but usually lasts only a few minutes and causes no permanent damage. The signs and symptoms of TIA resemble those found early in a stroke and may include sudden onset of: weakness, numbness or paralysis in the face, arm or leg, typically on one side of the body; slurred or garbled speech or difficulty understanding others; difficulty with vision; dizziness or loss of balance or coordination. Most signs and symptoms disappear within an hour.  See "Transient Ischemic Attack," National Institutes of Health (NIH) (available at https://www.nlm.nih.gov/medlineplus/transientischemicattack.html) (last accessed February 16, 2016).

In determining Plaintiff's RFC, the ALJ found that Plaintiff's allegations concerning the intensity, persistence and limiting effects of his symptoms were not fully credible.

At the fourth step of his analysis, the ALJ found that Plaintiff could not perform any of his past relevant work.

At the fifth step, the ALJ found that Plaintiff could perform jobs that existed in significant numbers in the national economy. Based upon testimony from the VE, the ALJ cited security guard and surveillance systems monitor as examples of work that Plaintiff could perform. Having concluded that Plaintiff could perform such work, the ALJ found that, as defined by the Act, Plaintiff had not been under a disability at any time between June 21, 2005 and the date of his decision.

## **Standard of Review**

A claimant is disabled if he or she is unable "to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Claimants bear the initial burden of establishing disability. Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122 (1996). The Commissioner bears the burden of developing the record, DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991), and bears the burden of establishing that a claimant can perform "other work" at Step Five of the disability analysis process. Tackett, 180 F.3d at 1098.

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); see also Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).

FINDINGS AND RECOMMENDATION – 7

"Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Andrews, 53 F.3d at 1039.  The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision.  Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986).  The Commissioner's decision must be upheld, however, even if "the evidence is susceptible to more than one rational interpretation."  Andrews, 53 F.3d at 1039-40.

### Discussion

Plaintiff contends that the ALJ failed to properly consider the opinions of treating and examining physicians, erred in finding that he was not wholly credible, erred in determining that he did not meet the requirements for a finding of presumptive disability under Listing 12.02, and did not meet the burden of establishing that Plaintiff could perform jobs that existed in significant numbers in the national economy.

**I.  Plaintiff's Credibility**

As noted above, in evaluating Plaintiff's RFC, the ALJ found that Plaintiff's allegations concerning the intensity, persistence and limiting effects of his symptoms were not fully credible.

**A.  Standards**

The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities. Andrews, 53 F.3d at 1039. If a claimant produces medical evidence of an underlying impairment that is reasonably expected to produce some degree of the symptoms alleged, and there is no affirmative evidence of malingering, an ALJ must provide

"clear and convincing reasons" for an adverse credibility determination. Smolen v. Chater, 80 F.3d 1273, 1281 (9th Cir.1996); Greger v. Barnhart, 464 F.3d 968, 972 (9th Cir.2006).

In evaluating a claimant's credibility, an ALJ must examine the entire record and consider several factors, including the claimant's daily activities, medications taken and their effectiveness, treatment other than medication, measures other than treatment used to relieve pain or other symptoms, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." SSR 96–7. An ALJ may also consider such factors as a claimant's inconsistent statements concerning symptoms and other statements that appear less than candid, unexplained or inadequately explained failure to seek treatment or follow a prescribed course of treatment, medical evidence tending to discount the severity of the claimant's subjective claims, and vague testimony as to the alleged disability and symptoms. Tommasetti v. Astrue, 533 F.3d 1035, 1040 (9th Cir.2008).

If substantial evidence supports the ALJ's credibility determination, it must be upheld, even if some of the reasons cited by the ALJ are not correct. Carmickle v. Commissioner of Social Security, 533 F.3d 1155, 1162 (9th Cir.2008).

## B. Analysis

Plaintiff alleges that his ability to work is limited by a combination of physical and mental impairments. In a 2008 Function Report, Plaintiff described symptoms including seizures, vision problems, numbness and weakness in his arms and legs, dizziness, nausea and muscle spasms. Ex.1E. In a Disability Report that appears to have been submitted in February 2009, Plaintiff reported weakness in his left leg, arm, hand, and shoulder that gave him less use of the left side of his body. Ex. 13E. At his 2009 hearing, Plaintiff testified that picking up a coffee cup or grocery bag with his left hand was difficult. In 2013, he testified he could walk for about 15

minutes, stand for 30 minutes, and carry 20 pounds in his right hand. He testified that climbing

stairs was very difficult, he loses his balance in the shower and that when he tries to lift or carry

something with his left hand, it slips out of his grip. Plaintiff testified that he last used

methamphetamine in 2004, that he went through the "AA" program in 2002 but had used alcohol

since then, though "nothing excessive," and had not consumed alcohol for over a year.

Because Plaintiff here produced evidence of impairments that could reasonably be

expected to produce some symptoms and there was no affirmative evidence of malingering, the

ALJ was required to provide clear and convincing reasons for concluding that Plaintiff was not

wholly credible.

The ALJ cited several reasons for concluding that Plaintiff was not wholly credible. The

ALJ noted inconsistencies in Plaintiff's statements regarding his alcohol use, hobbies, activities

of daily living, and work activity. He also noted inconsistencies between Plaintiff's statements

and the medical record and Plaintiff's "evasive" responses during the administrative hearing.

These were clear and convincing reasons for finding Plaintiff's allegations less than wholly

credible. "One strong indication of the credibility of an individual's statements is their

consistency, both internally and with other information in the case record." SSR 96-7p available

at 1996 WL 374186, at *4. An ALJ may consider prior inconsistent statements concerning

symptoms and "other testimony by [plaintiff] that appears less than candid in weighing plaintiff's

credibility." Tommasetti, 533 F.3d at 1039.

The ALJ appropriately discredited Plaintiff's testimony on the basis of inconsistent

statements regarding his alcohol use. At the July 11, 2013 hearing, Plaintiff testified that it had

been over a year since he last consumed alcohol. Tr. 725. However, as the ALJ correctly noted,

in March 2010, Plaintiff denied any alcohol use or abuse; in April 2010, he reported drinking 3-4

beers daily; in June of that year he reported drinking beer with friends 1-2 times per week; in August 2010, he reported drinking a six-pack of beer on the weekends. The ALJ also noted that in March 2011 and January 2012, Plaintiff reported drinking 1-2 times per week; in August 2012 he reported he had stopped drinking but had been drinking on a daily basis; and in January 2013 he reported he was drinking 1-2 times per week with 1-2 drinks per occasion. Conflicting or inconsistent testimony concerning alcohol or drug use can contribute to an adverse credibility finding. Verduzco v. Apfel, 188 F.3d 1087, 1090 (9th Cir.1999); Thomas v. Barnhart, 278 F.3d 947, 959 (9th Cir.2002) (ALJ's finding that claimant was not a reliable historian regarding drug and alcohol usage supports negative credibility determination). It was appropriate for the ALJ to find Plaintiff's lack of candor regarding his alcohol use diminished his credibility.

The ALJ also cited inconsistencies between Plaintiff's statements and his activities, including his hobbies, activities of daily living and work activity. The ALJ noted that despite allegations of disabling symptoms and limitations, Plaintiff was able to walk for exercise, care for his daughters, drive himself (despite the fact that he did not have a driver's license), walk with a metal detector, go into the mountains to collect firewood, and collect and dismantle recycling items for scrap in order to make money. These were valid reasons for discounting Plaintiff's credibility. While a claimant need not be "utterly incapacitated" to be found disabled. Fair v. Bowen, 885 F.2d 597, 603 (9th Cir.1989); a claimant's daily activities may undermine his subjective symptom testimony if they contradict other parts of the claimant's testimony. Orn v. Astrue, 495 F.3d 625, 639 (9th Cir. 2007). The evidence here supports the ALJ's finding that Plaintiff's allegations of complete disability were inconsistent with his activities of daily living.

The ALJ noted that Plaintiff provided inconsistent reports regarding his hobby of fishing. The record reflects that Plaintiff sometimes reported he was unable to fish and other times

related that he could and did fish.  Plaintiff's reports regarding his ability to stand while fishing

and his ability to fish from a boat are also internally inconsistent. The ALJ also cited Plaintiff's

inconsistent reports of his work history, noting that Plaintiff had testified both that he stopped

working in June 2005 and that he worked full-time through September of 2007. In February

2007, Plaintiff reported he was trying to get a job and at the initial hearing Plaintiff testified he

worked until 2007.  At his second hearing, Plaintiff testified he could not remember whether he

last worked in 2007.  These inconsistencies are a sufficient basis to support the ALJ's credibility

finding. See, Burch v. Barnhart, 400 F .3d 676, 680 (9th Cir.2005)(inconsistencies in claimant's

testimony can serve as clear and convincing reason for discrediting it).

Plaintiff argues that the inconsistencies in Plaintiff's statements "are not explainable on

the basis that Plaintiff is attempting to mislead anyone in order to obtain benefits to which he is

not entitled," and that these inconsistencies "are entirely appropriate given the objective evidence

of Plaintiff's brain pathology." Pl. Brief 22-23.  Defendant asserts that a credibility finding does

not relate to whether one intends to mislead but is, instead, a determination of whether a

witness's testimony is reliable. Defendant argues that the ALJ's finding that Plaintiff was not a

reliable witness because of inconsistencies in his statements is a reasonable conclusion regardless

of whether those inconsistencies resulted from an intent to mislead.  I agree.  Social Security

Ruling 96-7p provides that "the credibility of an individual's statements about pain or other

symptoms and their functional effects is the degree to which the statements can be believed and

accepted as true." Thus, in making a credibility determination, an ALJ is not judging a witness's

character but is merely evaluating the reliability of the evidence provided.  The ALJ here cited

numerous inconsistencies in Plaintiff's statements and reasonably concluded that those

inconsistencies undermined the degree to which Plaintiff's statements could be accepted as true.

FINDINGS AND RECOMMENDATION – 12

The ALJ also found that Plaintiff's allegations of disabling symptoms were inconsistent with a number of clinical findings.  The ALJ noted that medical imaging and examination documented Plaintiff's encephalomalacia[3] but that Plaintiff's traumatic brain injury had occurred 18 years before the alleged onset date, there was no objective evidence that this injury had worsened and Plaintiff was able to work in spite of this injury. The ALJ acknowledged clinical evidence documenting Plaintiff's TIA history but noted that the attacks occurred almost three years after the alleged onset date and that records reflected Plaintiff was doing well after his carotid endarterectomy.  The ALJ also noted clinical findings that documented Plaintiff's history of non-compliance with diabetes and mental health related treatment and the efficacy of conservative treatment for left shoulder pain. An ALJ may properly rely on an "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment" to discredit a claimant's subjective symptom testimony. Tommasetti, 533 F.3d at 1039 (quoting Smolen, 80 F.3d at 1284) (internal quotations omitted).

As Plaintiff correctly points out, the Ninth Circuit has criticized reliance on a lack of treatment as a basis to reject mental complaints, opining that it is "a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation." Nguyen v. Chater, 100 F.3d 1462, 1465 (9th Cir.1996). Furthermore, lack of treatment is justifiable when the record establishes that a claimant cannot afford it. Regennitter v. Commissioner, 166 F.3d 1294, 1296–97 (9th Cir.1999).

---

[3] Encephalomalacia is the softening or loss of brain tissue after cerebral infarction, cerebral ischemia, infection, craniocerebral trauma, or other injury. .  See "Encephalomalacia in the frontal lobe," National Institutes of Health (NIH) (available at http://www.ncbi.nlm.nih.gov/pubmed/22134284) (last accessed February 16, 2016).

FINDINGS AND RECOMMENDATION – 13

Plaintiff cites four treatment notes from March and September 2007 in which Plaintiff reported an inability to pay for blood pressure and allergy medications or for close follow up care. Plaintiff also cites a visit note from March 2007 in which he reported to his treatment provider that his mother was willing to pay for mental health treatment.  In contrast there is a voluminous medical record reflecting that Plaintiff engaged with numerous health providers for both mental and physical health issues over a number of years.  The record reflects that Plaintiff nevertheless missed multiple appointments with his treating mental health provider (Tr. 1370), failed to establish care with a new provider despite assistance from his girlfriend and other health providers (Tr. 991), expressed disinterest in continuing mental health care (Tr. 422), was erratic in his insulin use and checks of his blood sugar (Tr. 486), and continued to use alcohol despite repeated advice to stop. Under these circumstances, it was reasonable for the ALJ to discount Plaintiff's credibility based on an "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment." Tommasetti, 533 F.3d at 1039.

Plaintiff argues that in evaluating Plaintiff's credibility and responding to Plaintiff's arguments regarding that evaluation, the ALJ and the Commissioner relied to an improper extent on select evidence from the record and the first ALJ's decision and have disregarded the fact that the record at the time of the second hearing was "substantially different" from that under consideration at the time of the initial hearing. According to Plaintiff, this "substantially different" record supports the findings of Drs. Hamby and Kiley and Plaintiff's own credibility. Specifically, Plaintiff asserts that brain imaging done in July 2010 disclosed progressive worsening of his brain pathology and that the ALJ showed "no awareness" of this imaging and erred in his interpretation of the medical evidence.

FINDINGS AND RECOMMENDATION – 14

Plaintiff's argument is unavailing. The ALJ's decision does rely to an extent, for reasons he explained, on the previous ALJ's decision. However, the current decision also reflects both the ALJ's awareness and evaluation of the entire medical record, including evidence post-dating the initial hearing. The ALJ specifically remarked on imaging done in July, 2010, January 2012 and January 2013 and on medical evaluations completed in 2011, 2012 and 2013.

As to the July 2010 brain scan to which Plaintiff refers, this scan itself predates the initial hearing. Dr. Stephan Thiede interpreted the results. His impressions included: "interval progression of hyperintense T2 and FLAIR signal foci . . . concerning for advanced microvascular ischemic disease or previous, old ischemic results . . . ischemic injury has progressed since 08/06/2008." The scan also reflected that there was "cystic encephalomalacia in the left temporal lobe which is similar to FLAIR sequence performed on 08/06/2008 examination."

In an office visit in July 2010 to review Plaintiff's scan results, Dr. Michelle Wyatt made no comment regarding the status of Plaintiff's encephalomalacia. She noted that the MRA showed progression of small vessel disease since August 2008 but commented that this was when Plaintiff had his stroke and before his carotid endarterectomy so it was possible that his stroke had not been completed on imaging and thus appeared to be progressing. During that same visit, Dr. Wyatt noted that Plaintiff's motor strength was 4.5/5 on the left arm and leg, which was weaker compared to the right but "fairly strong." Romberg test was negative, finger to nose was intact and Plaintiff was able to walk on toes, heels and tandem gait. The record reflects numerous similar findings by Plaintiff's treating physicians. See, e.g., Tr. 937 (Jan. 2013, "unchanging left sided weakness," "patient remains clinically unchanged" with respect to carotid artery stenosis with infarction); Tr. 1381(Apr. 2011, "mild left sided weakness"); Tr. 1385, (Mar. 2011, "patient

denies any recent neurologic symptoms that can be construed as new TIAs in nature," "left sided weakness noted"). In addition, while not addressed specifically by either party or the ALJ, I find it significant that records of Plaintiff's office visits with Dr. Karl Saxman dated June 29, 2012 through March 11, 2013, reflect no treatment or discussion of Plaintiff's brain-related symptoms other than a brief notation of the 2008 stroke, left sided weakness and "sensory discomfort" in the left foot.

After a thorough review of the record as a whole, including the evidence developed subsequent to the initial hearing, I am satisfied that the ALJ's credibility determination was supported by substantial evidence. The ALJ's decision reflects that he was aware of and evaluated the pertinent evidence. Although the ALJ must consider all evidence in the record, he need not discuss all the evidence presented but only significant probative evidence. Vincent on Behalf of Vincent v. Heckler, 739 F.2d 1393, 1394–95 (9th Cir.1984).

As Defendant points out, Plaintiff challenges some, but not all, of the reasons provided by the ALJ. Thus any argument against those non-challenged reasons is deemed waived. The ALJ here provided several clear and convincing reasons for his credibility determination, and his assessment was supported by substantial evidence. Under these circumstances, the credibility determination should be upheld. See, e.g., Carmickle, 533 F.3d at 1162 (where supported by substantial evidence, ALJ's credibility determination upheld even if some reasons offered are incorrect).

## II. **Evaluation of Medical Evidence**

Plaintiff contends that the ALJ erred in failing to credit the opinions of treating physician Dr. James Kiley and examining physician Dr. John Hamby.

**A. Applicable Standards**

The ALJ is required to consider all medical opinion evidence and is responsible for resolving conflicts and ambiguities in the medical testimony. Tommasetti, 533 F.3d at 1041. In reviewing an ALJ's decision, the court does not assume the role of fact-finder, but instead determines whether the decision is supported by substantial evidence in light of the record as a whole. Matney v. Sullivan, 981 F.2d 1016, 1019 (9th Cir.1992).

Because treating physicians have a greater opportunity to know and observe their patients, their opinions are given greater weight than the opinions of other physicians. Rodriguez v. Bowen, 876 F.2d 759, 761–62 (9th Cir.1989).  An ALJ must provide clear and convincing reasons for rejecting a treating physician's uncontroverted opinions, Lester v. Chater, 81 F.3d 821, 830–31 (9th Cir.1995), and must provide "specific, legitimate reasons ... based upon substantial evidence in the record" for rejecting opinions of a treating physician which are contradicted. Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir.1989) (citations omitted).

The opinion of an examining physician is entitled to greater weight than the opinion of a non-examining physician. Pitzer v. Sullivan, 908 F.2d 502, 506 (9th Cir.1990). An ALJ must provide clear and convincing reasons for rejecting the uncontradicted opinions of an examining physician, id., and must support the rejection of an examining physician's opinion that is contradicted by another physician with specific and legitimate reasons that are supported by substantial evidence in the record. Andrews, 53 F.3d at 1043. A non-examining physician's opinion "cannot by itself constitute substantial evidence that justifies rejection of the opinion of either an examining physician or a treating physician." Lester, 81 F.3d at 830–31.

**B. Dr. James Kiley**

Dr. Kiley began as Plaintiff's treating neurologist in June 2008 and Plaintiff had six treatment visits with him between that date and January 6, 2011. In treatment notes from Plaintiff's final visit in January 2011, Dr. Kiley noted that Plaintiff continued to have left-sided weakness and a lack of coordination with his left arm and hand and had developed a worsening gait and balance problems. On exam, Plaintiff appeared pleasant, cooperative and well-groomed but was at times sad and frustrated; his walking was unstable and hemiparetic, he demonstrated "obvious fine finger movement and coordination problems with his left hand and left arm," he had decreased muscle bulk in both feet and legs and reduced reflexes in his ankles. Dr. Kiley opined "At this point, I do not, unfortunately, have too much to offer Darrell. He really needs to focus on maximizing his control of his hypertension, diabetes, cholesterol, and quitting smoking. I do not see how he is going to be able to work. He has just too many physical and emotional problems . . . I do not see his condition dramatically improving at this point." Tr. 929.

Because Dr. Kiley's opinion was contradicted by those of State agency physicians, the ALJ was required to provide specific and legitimate reasons supported by substantial evidence in the record for its rejection. The ALJ found that to the extent Dr. Kiley's comments suggested that Plaintiff was incapable of any work activity, that opinion was not persuasive. He also concluded that Dr. Kiley's comments were not entitled to any weight because they were inconsistent with the record and Plaintiff's reported activities, because it was unclear whether he was referring to Plaintiff's ability to perform his past work or any work in general, and because Dr. Kiley failed to offer any specific functional limitations.

In challenging these reasons, Plaintiff argues that Dr. Kiley "was not unaware of the questions being raised about Plaintiff's symptoms," that his treatment of Plaintiff and the 2010

brain imaging "appear to have removed any question Dr. Kiley might have retained concerning the entire etiology of Plaintiff's symptoms," and that he "was, perhaps, in a more advantageous position . . . to render an opinion concerning Plaintiff's ability to engage in substantial gainful activity." Pl. Brief at 27-28. Plaintiff also argues that Dr. Kiley's opinion was entitled to weight because it was supported by his own examination findings.  However, as Defendant notes, the ALJ did not reject Dr. Kiley's opinion for this reason.

The record supports the ALJ's conclusion that Plaintiff's activities and the evidence of record were not consistent with the level of impairment Dr. Kiley appeared to suggest.  As discussed above, the ALJ noted that Plaintiff was able to go fishing, drive, walk for exercise and while using a metal detector, help care for his children and perform other activities of daily living that indicated a higher level of function than Dr. Kiley suggested.  These activities supported the ALJ's rejection of Dr. Kiley's opinion. See, e.g. Morgan v. Comm'r. Soc. Sec. Admin., 169 F.3d 595, 602-03(ALJ may reject doctor's opinion inconsistent with claimant's activities).

The ALJ's rejection of Dr. Kiley's opinion based on its lack of specificity and conclusory nature regarding Plaintiff's ability to do work was also legally sufficient. An ALJ is not required to find a physician's opinion as to a claimant's physical condition or as to the ultimate question of disability conclusive. Morgan, 169 F.3d at 600. Nor is an ALJ required to accept a physician's medical opinion that it is vague. Id. at 601 (affirming an ALJ's discrediting of a physician's opinion because the opinion does not show how plaintiff's "symptoms translate into specific functional deficits which preclude work activity"); Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir.2005) (ALJ need not accept medical opinions that are brief and conclusory).

The ALJ's observation that Dr. Kiley did not suggest any specific functional limitations is also accurate, and supports his rejection of Dr. Kiley's opinion that Plaintiff is disabled. In the absence of any objective functional analysis of Plaintiff's abilities to perform work-related activities, Dr. Kiley's comment that he did "not see how [Plaintiff] is going to be able to work" was effectively a vocational rather than a medical opinion. This is significant, because vocational assessments are an area reserved for the Commissioner. See Harman v. Apfel, 211 F.3d 1172, 1189 (9th Cir.2000); Frank v. Barnhart, 326 F.3d 618, 620 (5th Cir.2003) (doctor's opinion as to whether claimant could work was not "medical opinion" within meaning of relevant regulations).

The ALJ is responsible for resolving conflicts and ambiguities in the medical testimony. Tommasetti, 533 F.3d at 1041. A careful review of the ALJ's decision and the administrative record fully supports the conclusion that the ALJ's reasons for rejecting Dr. Kiley's opinion were legally and factually sound. Therefore, his findings should be affirmed even if the evidence is "susceptible to more than one rational interpretation." Magallanes, 881 F.2d at 750,(citing Gallant v. Heckler, 753 F.2d 1450, 1453 (9th Cir.1984)); see also Jamerson v. Charter, 112 F.3d 1064, 1067 (9th Cir.1997) ("[T]he key question is not whether there is substantial evidence that could support a finding of disability, but whether there is substantial evidence to support the Commissioner's actual finding that claimant is not disabled."). "Where 'the evidence can reasonably support either affirming or reversing a decision, we may not substitute our judgment for that of the [ALJ].'" Garrison v. Colvin, 759 F.3d 995, 1010 (9th Cir.2014)(citing Andrews, 53 F.3d at 1039).

**C. Dr. John Hamby**

Neurologist John Hamby, M.D., examined Plaintiff in November 2011. Plaintiff reported he no longer fished, was limited to walking half a block and drank 4 beers twice per week but

FINDINGS AND RECOMMENDATION – 20

denied any history of alcohol or other substance abuse. He stated he was limited to standing for

15 minutes, sitting for 20 minutes and to carrying 10 pounds. On examination, Plaintiff's gait

was slow with a somewhat unsteady balance and his left upper extremity was clumsy, had poor

grasping ability due to weakness and ataxia, and had limited range of motion and diminished

sensation.  However, Plaintiff exhibited 5/5 motor strength in the upper and lower extremities

bilaterally.  Dr. Hamby opined that Plaintiff was limited to standing for fifteen minutes at a time

for up to two hours per day, limited to walking ten minutes at a time for up to one hour per day

and needed a single point cane for long distances and uneven terrain.  He opined that Plaintiff

could lift 10 pounds frequently, had no sitting limitations, could reach and handle only rarely

with his left arm; could never finger or feel with his left arm; and had no manipulative

limitations to his right arm.

Because Dr. Hamby's opinion was contradicted by those of State agency physicians, the

ALJ was required to provide specific and legitimate reasons supported by substantial evidence in

the record for its rejection. The ALJ accorded no weight to Dr. Hamby's opinion because it

relied on Plaintiff's unreliable reporting and was inconsistent with generally unremarkable

examination findings.  The ALJ noted that the information Plaintiff provided Dr. Hamby

regarding his activities and limitations was contrary to evidence in the record.  He also noted that

Dr. Hamby pointed only to objective limitations involving Plaintiff's left side, that Plaintiff's

motor strength was 5/5 in both arms and legs and straight leg raise testing was normal. These

were specific and legitimate bases for discounting Dr. Hamby's opinion as to the extent of

Plaintiff's limitations. See Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir.1999) (lack of

clinical findings is specific and legitimate reason for rejecting treating physician's opinions);

<u>Morgan</u>, 169 F.3d at 602 (doctor's opinion premised on claimant's accounts of symptoms and limitations may be disregarded if claimant's complaints properly discounted).

The ALJ provided specific, legitimate reasons for discounting Dr. Hamby's opinion, and these reasons were supported by substantial evidence in the record.

### III. <u>Listing 12.02</u>

As noted above, at the third step of the disability analysis, an ALJ must consider whether the claimant's impairments, alone or in combination, meet or medically equal a listed impairment. 20 C.F.R. § 404.1520(d). Plaintiff contends that if Plaintiff's testimony is deemed credible and the opinions of Dr. Kiley and Hamby are appropriately considered, then Plaintiff is presumptively disabled under Listing 12.02 – Organic Mental Disorders. See 20 C.F.R. Part 404, Subpart P, App. 1, Listing 12.02. A claimant bears the burden of establishing that an impairment meets or equals an impairment in the Listings. <u>Burch</u>, 400 F.3d at 683.

The requirements of Listing 12.02 are satisfied if a claimant meets the requirements of Paragraphs A and B, or C. <u>See</u> 20 C.F.R. pt. 404, Subpt. P. App. 1, § 12.02. Paragraph A requires medical findings that establish the existence of particular conditions, and Paragraph B requires that the relevant impairments result in two of the following: 1) marked restriction in activities of daily living; 2) marked difficulties maintaining social functioning; 3) marked difficulty maintaining concentration, persistence, or pace; or 4) repeated extended episodes of decompensation. <u>Id</u>. The requirements of 12.02(C) are satisfied if the claimant has a "[m]edically documented history of a chronic organic mental disorder [or affective disorder] that has lasted at least 2 years and has caused more than a minimal limitation in the ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support and either 1) repeated episodes of decompensation of extended duration; 2) a residual disease

FINDINGS AND RECOMMENDATION – 22

process that has resulted in such marginal adjustment that a minimal increase in mental demands or change in the environment would likely result in decompensation; or 3) a current history of 1 or more years of inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement. Id. at 12.02(C).

Plaintiff here asserts that his mental impairment meets the requirements of Paragraph B but points to no evidence in the record that supports this contention. Furthermore, as discussed above, the ALJ reasonably concluded that Plaintiff's statements were less than wholly credible and provided an adequate basis for discounting the opinions of Drs. Hamby and Kiley, upon whose evidence Plaintiff relies to support his argument that he is presumptively disabled under the Listing. Under these circumstances, Plaintiff's argument that the ALJ erred in determining that Plaintiff did not meet a Listing is without merit.

## IV. ALJ's Step Five Findings

Plaintiff contends that the ALJ failed to adequately support his conclusion, at step five, that Plaintiff could perform "other work" that exists in significant numbers in the national economy. At the hearing, in response to hypotheticals provided by the ALJ, the VE testified that Plaintiff would be capable of performing the occupations of security guard and surveillance system monitor. He testified that there were about 7000 surveillance system monitor jobs in the national economy and about 100 in Oregon. The VE testified that there were about 325,000 security guard jobs in the national economy and 2,700 in Oregon. He also testified that the number of available security guard jobs he cited reflected an approximate 50 percent reduction to preclude jobs that required more than occasional public contact and standing or walking more than six hours a day.

**A. Security Guard**

Plaintiff argues he is limited to occasional handling with his left hand and, as such, is precluded from working as a security guard, which requires frequent "reaching" and frequent "handling." Plaintiff also contends that the ALJ erred in accepting the VE's reduction of the number of security guard positions for which Plaintiff would qualify given his limitations in standing, walking and public exposure.

Plaintiff argues that according to the opinion of State Agency physician Dr. Neal Berner, which the ALJ gave significant weight, he has an additional limitation of only occasional handling with his left hand. Although Dr. Berner did remark in the explanatory section of his report that Plaintiff was limited to occasional left hand manipulation secondary to decreased strength and ability to grasp, he also very explicitly indicated while Plaintiff had limitations in fingering, he had no limits on handling, reaching or feeling. As Defendant correctly notes, state agency medical consultants "are highly qualified physicians . . . who are experts in the evaluation of the medical issues in disability claims under the Act." SSR 96-6p available at 1996 WL 374180 at *2. It was reasonable for the ALJ to rely on Dr. Berner's opinion in concluding that Plaintiff was limited to occasional fingering with his left hand and had no handling limitations.

Plaintiff also argues that the ALJ improperly relied on the VE's testimony regarding the number of security guard jobs. As noted above, in response to standing, walking and public interaction limitations provided in a hypothetical reflecting Plaintiff's RFC, the VE reduced the number of existing security guard jobs by 50 percent. Plaintiff argues that this reduction was arbitrary and thus insufficient support for the ALJ's conclusions that a significant number of security guard jobs exist that Plaintiff is able to perform and that he capable of performing other work in the national economy.

The VE here testified regarding the job of security guard based on the Dictionary of Occupational Titles (DOT), a Department of Labor publication, a publication of the Oregon Employment Department, and his own experience. Tr. 733. The ALJ inquired whether the VE's testimony had been consistent with the DOT and the VE confirmed that it had been, other than the exceptions he had noted and clarified. Tr. 737. Plaintiff's counsel at the hearing did not question the VE at the time regarding his reduction of job numbers. Plaintiff did not and does not here object to the VE's qualifications.

Plaintiff argues that the court recently faced substantially similar evidence and "identical functional limitations" to those in this case and concluded that a 50 percent reduction in the number of security guard jobs was arbitrary. Veteto v. Colvin, 6:13-cv-00298-MO, 2014 WL 412414. On the record before it, the court concluded that the 50 percent reduction "*appears arbitrary and unsupported by factual evidence . . . .*" Id. at *6(emphasis added). A review of Veteto does reveal what is, on the surface, a strikingly similar set of circumstances to the present case. However, on the record before this court and guided by case law from the Ninth Circuit Court of Appeals, I conclude that the ALJ here was entitled to rely upon the expertise of the VE as to the number of security guard jobs that existed that Plaintiff could perform. See Osenbrock v. Apfel, 240 F.3d 1157, 1163 (9th Cir.2001) ("The testimony of a vocational expert constitutes substantial evidence supporting an ALJ's decision."); see also Bayliss, 427 F.3d at 1218 ("A VE's recognized expertise provides the necessary foundation for his or her testimony."); Johnson v. Shalala, 60 F.3d 1428, 1435 (9th Cir. 1995)(ALJ may take administrative notice of VE testimony addressing the number of available jobs). Accordingly, I find no error.

**B. Surveillance System Monitor**

Plaintiff contends that if he is unable to work as a security guard, the small number of

security systems monitoring positions existing nationally and in Oregon does not meet the

"significant numbers" standard necessary for the Commissioner to sustain her burden of proof

that Plaintiff can perform "other work."  Plaintiff acknowledges that there is no bright line rule

for determining what constitutes a "significant number of jobs," Beltran v. Astrue, 700 F.3d 386,

389 (9th Cir. 2012); but nonetheless argues that 7,000 jobs spread across the national economy

fails to satisfy the standard.  I agree.  While there is no bright-line rule, in comparing the number

of surveillance monitoring jobs cited by the VE with the number of jobs other courts have found

to constitute a significant number of jobs, I conclude that 7000 jobs nationally and 100 jobs

locally is not a significant number. See Meanel v. Apfel, 172 F.3d 1111, 1115 (9th Cir.1999)

(between 1,000 and 1,500 jobs regionally is significant number); Barker v. Secretary of Health

and Human Services, 882 F.2d 1474, 1479 (9th Cir.1989) (2,466 jobs in region is significant

number); Cf. Beltran, 700 F.3d at 390 (finding 135 regional jobs and 1,680 nationally not a

significant number); DiMartino v. Astrue, No. 2:09–cv–1097–JCC, 2010 WL 2196098, at *3

(W.D.Wash. May 27, 2010) (100 jobs regionally and 5,000 nationally is not significant number).

   Although, I conclude that the surveillance system monitor occupation does not represent

a significant number of jobs in the economy, the ALJ's finding that Plaintiff could perform

"other work" is, nevertheless, supported by substantial evidence. As discussed above, the ALJ

reasonably relied on the testimony from the VE regarding the occupation of security guard in

determining that Plaintiff could perform other work.  Even taking into account a 50 percent

reduction, the security guard occupation represents 325,000 jobs nationally and 2,700 jobs in

Oregon.  I conclude, and Plaintiff does not contest, that this constitutes a significant number of

jobs in the economy.  Accordingly, the ALJ's decision was supported by substantial evidence

and his decision should be affirmed.

FINDINGS AND RECOMMENDATION – 26

**Conclusion**

For the reasons set out above, a Judgment should be entered AFFIRMING the Commissioner's decision and DISMISSING this action with prejudice.


**Scheduling Order**

This Findings and Recommendation will be referred to a district judge. Objections, if any, are due March 21, 2016. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 2nd day of March, 2016.




 /s/ John Jelderks
John Jelderks
U.S. Magistrate Judge